FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| GREGORY R. GABRIEL,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>ALASKA ELECTRICAL PENSION<br>FUND; TRUSTEES OF THE ALASKA<br>ELECTRICAL PENSION FUND;<br>PENSION ADMINISTRATIVE<br>COMMITTEE OF THE ALASKA<br>ELECTRICAL PENSION FUND;<br>APPEALS COMMITTEE OF THE<br>ALASKA ELECTRICAL PENSION<br>FUND; GREGORY STOKES; GARY<br>BROOKS; STEVE BOYD; JOHN<br>GIUCHICI; CHERESA MacLEOD;<br>SCOTT BRINGMANN; DAVID CARLE;<br>JIM FULLFORD; MARY TESCH;<br>KNUTE ANDERSON; MIKE BAVARD;<br>LARRY BELL; VINCE BELTRAMI,<br>*Defendants-Appellees*. | No. 12-35458<br><br>D.C. No.<br>3:06-cv-00192-<br>TMB<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, District Judge, Presiding

Argued and Submitted
August 14, 2013—Anchorage, Alaska

Filed June 6, 2014

Before: Alex Kozinski, Chief Judge, and Marsha S. Berzon
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Partial Concurrence and Partial Dissent by Judge Berzon

---

## SUMMARY[*]

---

### Employee Retirement Income Security Act

The panel affirmed the district court's summary judgment
in favor of Alaska Electrical Pension Fund and other
defendants on claims (1) that the Fund abused its discretion
in denying the plaintiff benefits under the Alaska Electrical
Pension Plan and (2) that he was entitled to equitable relief
under ERISA.

For over three years, the Fund paid the plaintiff monthly
pension benefits he had not earned.  When it rediscovered an
earlier determination that the plaintiff had never met the
Plan's vesting requirements, it terminated his benefits.

The panel affirmed the district court's summary judgment
on the plaintiff's claim that the defendants violated their
fiduciary duties under ERISA or the terms of the Plan and
that he therefore was entitled to "appropriate equitable relief"
under 29 U.S.C. § 1132(a)(3).  The panel held that the

---

  [*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

plaintiff was not entitled to an order equitably estopping the Fund from relying on its corrected records that showed his actual years of service because he failed to show that a letter informing him that he would receive a pension was an interpretation of ambiguous language in the Plan, rather than a mere mistake in assessing his entitlement to benefits, and he also failed to show that he was ignorant of the true facts.  The panel held that the plaintiff was not entitled to the equitable remedy of reformation based on mistake under trust or contract law principles because he failed to demonstrate that a mistake of fact or law affected the terms of the Plan.  He also was not entitled to reformation based on fraud.  The panel held that the plaintiff was not entitled to the equitable remedy of surcharge, to receive an amount equal to the benefits he would have received if he had been a participant with the hours erroneously reflected in the Fund's records when he applied for benefits, because he did not show that the defendants were unjustly enriched by their alleged breaches of fiduciary duty.  In addition, the surcharge remedy the plaintiff sought would not restore the trust estate, but rather would wrongfully deplete it by paying benefits he was not eligible to receive under the Plan.

The panel also affirmed the district court's summary judgment on the plaintiff's claim that the defendants erred in denying him benefits on the ground that he was non-vested.  The panel rejected the plaintiff's argument that the Fund waived this rationale for denying him benefits by not timely raising it.

Judge Berzon concurred and dissented.  She dissented from Part II(B)(3) of the majority opinion because the plaintiff might be entitled to an equitable remedy similar to surcharge.  She wrote that the majority disregarded Supreme

Court guidance in *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011), and created a conflict with recent decisions of the Fourth, Fifth, and Seventh Circuits regarding the scope of the "surcharge" remedy.   Judge Berzon concurred in the remainder of the majority opinion.

---

## COUNSEL

Jennifer Mary Coughlin, K&L Gates, LLP, Anchorage, Alaska, for Plaintiff-Appellant.

Allen Bruce McKenzie (argued), and Frank J. Morales, McKenzie Rothwell Barlow & Coughran, P.S., Seattle, Washington, for Defendants-Appellees.

---

## OPINION

IKUTA, Circuit Judge:

Gregory R. Gabriel appeals the district court's dismissal of his claims against the Alaska Electrical Pension Fund (the Fund) and other defendants under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq.   Because Gabriel failed to raise a genuine issue of material fact that the Fund abused its discretion in denying him benefits, or that he was entitled to "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3), we affirm the district court.

I

For over three years, the Fund paid Gabriel monthly pension benefits he had not earned.  This case arises from the events that occurred after the Fund discovered this error.

From August 1968 through April 1975, Gabriel participated in the Alaska Electrical Pension Plan (the Plan).  The Plan is an "employee pension benefit plan" as defined in ERISA, 29 U.S.C. § 1002(2)(A).  It covers electrical workers and contractors who work for employers that participate in one of several electrical industry collective bargaining agreements.  The Plan is administered by the Fund, which is run by a board of trustees.  The Plan gives the trustees "the exclusive right to construe the provisions of the Plan and to determine any and all questions arising thereunder or in connection with the administration thereof."

Under section 5.01 of the Plan, a participant who has completed ten or more "[y]ears of service," as defined in the Plan, is vested under the Plan and is eligible to apply for pension benefits on retirement after reaching a specified age.  Section 8.01 provides that a participant who fails to earn a total of 500 hours of service in a two-year period, and is not on a qualifying leave of absence pursuant to section 8.02, is terminated from the Plan.  A terminated participant may be reinstated under section 8.04.  Under Section 8.03, a vested participant who is terminated is not devested; once vested, a participant remains vested.

Gabriel worked until April 1975 as an employee of several different electric companies that participated in the Plan.  In 1975, he became the sole proprietor of Twin Cities Electric.  From September 1975 through November 1978,

Twin Cities made contributions for both Gabriel and its employees. Based on these contributions, the Fund initially credited Gabriel with eleven years of service, enough to qualify Gabriel as a vested participant under section 5.01.

But in 1979, the Fund determined that Gabriel was an owner of Twin Cities, rather than an employee, and therefore not eligible to participate in the Plan. In a letter dated November 20, 1979, the Fund's general counsel informed Gabriel about this error and told him that the Fund owed him a refund of $13,626 for the erroneous contributions made on his behalf from 1975 to 1978. Further, the letter informed Gabriel that he was terminated from the Plan as of January 1, 1978, pursuant to section 8.01, because its records showed that by that time he had two consecutive years with less than 500 hours of service. An attachment to the letter, entitled "Benefit Statement Without Hours Reported By Twin Cities," stated that Gabriel had "8 yrs. Credited Service" from 1968 to 1975 when the improper hours for his time as an employer at Twin Cities were excluded, and that the Fund would update Gabriel's hours report to remove the improperly credited hours.

As a separate matter, the letter stated that, because Twin Cities had been delinquent in making contributions for its other employees, the Fund would set off the delinquent amounts owed to the Fund (a total of $6,989.24) from the refund amount owed Gabriel, for a total refund to Gabriel of $6,636.76.

On December 3, 1979, the Fund drafted a follow-up letter stating that Twin Cities actually owed more in delinquent obligations than the Fund originally had calculated. To satisfy Twin Cities' delinquent obligations for its employees,

the Fund intended to withhold $12,982.69, instead of $6,989.24. Therefore, the Fund would give Gabriel a refund of only $643.31. The letter enclosed a release agreement, which documented the terms of the setoff and refund. It also informed Gabriel about the steps he would have to take to become vested in the Plan. The record includes only an unsigned copy of this letter, which was found in the Fund's files. Gabriel asserts he never received this letter.

In January 1980, Gabriel signed the release agreement, in which he acknowledged that he was receiving a refund of $643.31 arising from "the improper employer contributions paid from the year 1975 through 1978" made on his behalf when he was the owner of Twin Cities, and that the remainder of the improper contributions (amounting to $12,982.69) would be used to pay delinquent obligations.

Gabriel did not meet any of the requirements under the Plan for reinstatement and so never vested in the Plan. Nevertheless, in late 1996, Gabriel asked the Fund for information about the amount of pension benefits he would receive if he retired. In a letter dated January 6, 1997, a pension representative for the Fund stated that it had calculated Gabriel's pension benefits based on his years of service from 1968 to 1978, and determined that, if he retired, Gabriel would receive pension benefits of $1,236 each month.

Gabriel subsequently retired and applied for benefits, which he began receiving in March 1997. In an affidavit submitted as part of this litigation, Gabriel stated that he would not have retired in 1997 if the pension representative had informed him he was ineligible to receive pension benefits.

The sequence of events leading the Fund to rediscover its error and terminate Gabriel's benefits began in May 2000. At that time, Gabriel began working part-time as an OSHA safety inspector for Udelhoven Oilfield Services to supplement his retirement income. In 2001, the Fund warned Gabriel that his work constituted prohibited post-retirement employment in the industry, which could lead to a suspension of benefits. Although Gabriel argued that his employment at Udelhoven was not in the same industry, the Fund nonetheless suspended his benefits on that basis in November 2001.

Gabriel challenged this suspension of benefits through the administrative process established in the Plan. First, Gabriel appealed the suspension to the Appeals Committee. The Committee denied his appeal, and Gabriel appealed again to the next administrative level, which required arbitration of the dispute. The arbitrator reversed the Appeals Committee's decision and remanded the issue for further fact finding.

At the remand hearing before the Appeals Committee, Gabriel learned that the Fund had not provided him with certain relevant Plan amendments. The Appeals Committee suspended the hearing to give Gabriel an opportunity to review the amendments. Before the Appeals Committee ruled on the dispute, Gabriel stopped working for Udelhoven, and the Fund reinstated his pension benefits as of July 1, 2004.

Gabriel nevertheless continued to pursue his claim against the Fund, and demanded payment of the benefits that the Fund had withheld due to his Udelhoven work, as well as attorney's fees and costs incurred in the administrative appeals process. The parties engaged in settlement

negotiations, and the Fund agreed to reimburse Gabriel's attorney's fees and costs. After further negotiations, the Fund also offered to pay Gabriel the withheld benefits, with interest.

Before Gabriel could respond to this offer, however, the Fund revoked it. The Fund rediscovered its earlier determination that Gabriel had been ineligible to participate in the Plan between September 1975 and November 1978, and therefore had never met the Plan's vesting requirements. Because Gabriel had never become eligible for retirement benefits, the Fund terminated Gabriel's benefits and threatened to seek reimbursement for the $81,033 in benefits Gabriel had previously received.[1]

In response, Gabriel brought an ERISA action in district court against the Fund, the Board of Trustees, the Pension Administrative Committee (comprised of trustees responsible for deciding benefit claims), the Appeals Committee, and various other individuals responsible for administering the Fund. In his complaint, Gabriel brought claims for recovery of benefits and clarification of rights to future benefits under 29 U.S.C. § 1132(a)(1)(B), and breach of the fiduciary duties set forth in 29 U.S.C. § 1104(a)(1)(A)–(B) and § 1109 under § 1132(a)(3).[2] The complaint also alleged misrepresentation and estoppel based on written and oral representations, as

---

[1] The Fund initially brought a counterclaim for reimbursement of these benefits against Gabriel in this litigation, but later voluntarily dismissed it.

[2] The complaint also alleged claims for breach of co-fiduciary duties set forth in 29 U.S.C. § 1105(a), under 29 U.S.C. § 1132(a)(3), but because these claims are derivative of his breach of fiduciary duty claims, we do not discuss them separately.

well as other claims not relevant here.  The defendants moved for summary judgment on all of Gabriel's claims.

The district court addressed the defendants' motion for summary judgment in a series of orders.  In its first order, the district court held that Gabriel had raised a genuine issue of material fact as to whether he had satisfied the Plan's vesting requirements, and therefore denied the defendants' summary judgment motion on Gabriel's claims under § 1132(a)(1)(B) for retroactive reinstatement of his monthly pension benefits to November 2001, and clarification of his rights to future benefits.  The district court remanded this claim to the Appeals Committee so Gabriel could exhaust his administrative remedies.  The district court rejected Gabriel's claim that the defendants were equitably estopped to deny him future pension benefits and granted summary judgment to the defendants on this claim.

On remand before the Appeals Committee, Gabriel no longer argued that he had satisfied the Plan's vesting requirements, but argued that his pension benefits should be reinstated because he had relied to his detriment on the 1997 determination by the pension representative that he was eligible for those benefits.  The Appeals Committee rejected this claim, finding that Gabriel was properly informed of the ten-year vesting requirement in the Fund's letters to him of November 20 and December 3, 1979.  It also held that, even if Gabriel relied to his detriment on the pension representative's statements, he was not entitled to have those benefits reinstated in violation of the express terms of the Plan.

In its second order, the district court rejected Gabriel's claims under § 1132(a)(3)(B) that he was entitled to equitable

relief due to the Fund's breaches of fiduciary duty because part of the relief Gabriel sought (compensatory damages in the form of benefits) was not equitable, and he was not entitled to the equitable relief he sought (restitution or imposition of a constructive trust) given his failure to show any fraud by the Fund.

In its third order, the district court held that it would review the Appeals Committee's final denial of benefits under an abuse of discretion standard, because the Plan provided the trustees with broad discretion to construe the terms of the Plan.  The court rejected Gabriel's claim that the Fund had waived its argument that he did not satisfy the Plan's vesting requirement, as well as Gabriel's argument that the Fund breached its obligation to inform him that he was non-vested in 1979.  Under its deferential standard of review, the district court concluded that the Appeals Committee's determination that Gabriel had been properly informed of the ten-year vesting requirement in the letters of November 20 and December 3, 1979, was not clearly erroneous.  The court therefore granted summary judgment in favor of the defendants on Gabriel's benefits claim.

After the district court resolved all his claims, Gabriel timely appealed.  We review a district court's grant of summary judgment de novo, and must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact. *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 975–76 (9th Cir. 1999).  We review de novo the district court's conclusion that an ERISA fiduciary did not abuse its discretion.  *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 552 (9th Cir. 1995).

## II

We begin by considering Gabriel's argument that the defendants violated their fiduciary duties under ERISA or the terms of the Plan, for which he is entitled to "appropriate equitable relief" under § 1132(a)(3).[3]

## A

The civil enforcement provisions of ERISA, codified in § 1132(a), are "the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52 (1987). Courts may not "infer [additional] causes of action in the ERISA context, since that statute's carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254 (1993) (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146–147 (1985)). Under ERISA, the issue is not

---

[3] Section 1132(a)(3) provides in pertinent part:

(a) Persons empowered to bring a civil action

A civil action may be brought— . . .

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

29 U.S.C. § 1132(a)(3).

whether the statute bars a particular cause of action, but rather "whether the statute affirmatively *authorizes* such a suit." *Id.* at 255 n.5.

Section 1132(a)(3) provides that "[a] civil action may be brought . . . (3) by a participant, beneficiary, or fiduciary . . . (B) to obtain other appropriate equitable relief (i) to redress [any act or practice which violates any provision of this subchapter or the terms of the plan] or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). Under this provision, a plaintiff must prove both (1) that there is a remediable wrong, *i.e.*, that the plaintiff seeks relief to redress a violation of ERISA or the terms of a plan, *see Mertens*, 508 U.S. at 254; and (2) that the relief sought is "appropriate equitable relief," 29 U.S.C. § 1132(a)(3)(B). A claim may fail if the plaintiff cannot establish the second prong, that the remedy sought is "appropriate equitable relief" under § 1132(a)(3)(B), regardless whether "a remediable wrong has been alleged." *Mertens*, 508 U.S. at 254.

The Supreme Court has made clear that "appropriate equitable relief" refers to a "remedy traditionally viewed as 'equitable.'" *Id.* at 255. Because "ERISA abounds with the language and terminology of trust law," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989), the Court relies heavily on trust law doctrine in interpreting ERISA, *see, e.g.*, *Conkright v. Frommert*, 559 U.S. 506, 512 (2010) (stating that, when "ERISA's text does not directly resolve the matter," the Court has "looked to 'principles of trust law' for guidance" (quoting *Firestone*, 489 U.S. at 109)).

In interpreting § 1132(a)(3), the Court has distinguished between equitable and legal relief. According to the Court,

Congress intended to limit the relief available under § 1132(a)(3) to "those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)," *Mertens*, 508 U.S. at 256, and did not authorize any legal remedies, even though an equity court was empowered to grant such relief, *id.* at 256–59.  Accordingly, in *Mertens* the Court rejected the plaintiffs' efforts to seek money damages to remedy alleged breaches of fiduciary duty.  *Id.* at 255. Further, the Court held that plaintiffs may not disguise an attempt to obtain monetary relief as a traditional equitable remedy.  For example, "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity," and thus is not available under § 1132(a)(3). *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210–11 (2002).  And although restitution can be an equitable remedy, "not all relief falling under the rubric of restitution is available in equity."  *Id.* at 212.  For instance, a plaintiff "had a right to restitution *at law* through an action derived from the common-law writ of assumpsit."  *Id.* at 213.  But "a plaintiff could seek restitution *in equity*" only "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession."  *Id.*

While ruling out legal remedies and limiting the availability of injunction, mandamus, and restitution in *Mertens* and *Great-West Life*, the Supreme Court has identified three forms of traditional equitable relief that may be available under § 1132(a)(3).

First, "appropriate equitable relief" may include "the reformation of the terms of the plan, in order to remedy the

false or misleading information" provided by a plan fiduciary. *CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1879 (2011). The power to reform contracts is available only in the event of mistake or fraud. *Id.*; *see also Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1166 (9th Cir. 2012). A plaintiff may obtain reformation based on mistake in two circumstances: (1) "if there is evidence that a mistake of fact or law affected the terms of [a trust] instrument and if there is evidence of the settlor's true intent"; or (2) "if both parties [to a contract] were mistaken about the content or effect of the contract" and the contract must be reformed "to capture the terms upon which the parties had a meeting of the minds." *Skinner*, 673 F.3d at 1166. Under a fraud theory, a plaintiff may obtain reformation when either (1) "[a trust] was procured by wrongful conduct, such as undue influence, duress, or fraud," or (2) a "party's assent [to a contract] was induced by the other party's misrepresentations as to the terms or effect of the contract" and he "was justified in relying on the other party's misrepresentations." *Id.*

Second, "appropriate equitable relief" may include the remedy of equitable estoppel, which holds the fiduciary "to what it had promised" and "'operates to place the person entitled to its benefit in the same position he would have been in had the representations been true.'" *Amara*, 131 S. Ct. at 1880 (quoting James W. Eaton, *Handbook of Equity Jurisprudence* § 62, p.176 (1901)). Under this theory of relief:

> "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant

of the true facts; and (4) he must rely on the
former's conduct to his injury."

*Greany v. W. Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821
(9th Cir. 1992) (quoting *Ellenburg v. Brockway, Inc.*,
763 F.2d 1091, 1096 (9th Cir. 1985)); *see also* 1 John Norton
Pomeroy, *A Treatise on Equity Jurisprudence* § 805,
pp.190–98 (5th ed. 1941).

A plaintiff seeking equitable estoppel in the ERISA
context must meet additional requirements.[4] First, we have
consistently held that a party cannot maintain a federal
equitable estoppel claim in the ERISA context when recovery
on the claim would contradict written plan provisions.
*Greany*, 973 F.2d at 822 (non-trust fund defendants);
*Davidian v. S. Cal. Meat Cutters Union & Food Emps.
Benefit Fund*, 859 F.2d 134, 136 (9th Cir. 1988) (trust fund
defendant). This principle is derived from ERISA's
requirement that "[e]very employee benefit plan shall be
established and maintained pursuant to a written instrument."
29 U.S.C. § 1102(a)(1). The purpose of this requirement is to
protect "the plan's actuarial soundness by preventing plan

---

[4] Although our cases have sometimes discussed equitable estoppel
claims as if they were independent causes of action, *see, e.g.*, *Greany*,
973 F.2d at 821, the Supreme Court has now clarified that courts may not
"infer causes of action in the ERISA context" beyond what is set forth in
the statute, and has instructed us to analyze equitable estoppel as a form
of "appropriate equitable relief" under § 1132(a)(3)(B), *Mertens*, 508 U.S.
at 254. But because our estoppel precedent relied on traditional equitable
principles, *see United States v. Ga.-Pac. Co.*, 421 F.2d 92, 96 (9th Cir.
1970) (citing 3 Pomeroy, *Equity Jurisprudence* §§ 801–02, 804), and
*Lavin v. Marsh*, 644 F.2d 1378, 1382 (9th Cir. 1981)), it continues to
inform our understanding of what constitutes "appropriate equitable
relief."

administrators from contracting to pay benefits to persons not entitled to them under the express terms of the plan." *Rodrigue v. W. & S. Life Ins. Co.*, 948 F.2d 969, 971 (5th Cir. 1991); *see also Greany*, 973 F.2d at 822 (citing *Rodrigue*, 948 F.2d at 971). Accordingly, a plaintiff may not bring an equitable estoppel claim that "would result in a payment of benefits that would be inconsistent with the written plan," or would, as a practical matter, result in an amendment or modification of a plan, because such a result "would contradict the writing and amendment requirements of 29 U.S.C. §§ 1102(a)(1) and (b)(3)." *Greany*, 973 F.2d at 822. For the same reason, "oral agreements or modifications cannot be used to contradict or supersede the written terms of an ERISA plan." *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 986 n.2 (9th Cir. 1997); *see also Thurber v. W. Conf. of Teamsters Pension Plan*, 542 F.2d 1106, 1109 (9th Cir. 1976) (per curiam) (holding in an analogous context that an employee's reliance on advice from a pension administrator did not estop the pension fund from denying benefits because "[t]he rights of other pensioners must be considered, and the trust fund may not be deflated because of the misrepresentation or misconduct of the Administrator of the fund"). The same rule applies to informal written interpretations of an ERISA plan. *See Nat'l Cos. Health Benefit Plan v. St. Joseph's Hosp.*, 929 F.2d 1558, 1572 (11th Cir. 1998) (holding that "use of the law of equitable estoppel to enforce informal written interpretations will not undermine the integrity of ERISA plans"), *abrogated on other grounds by Geissal v. Moore Med. Corp.*, 524 U.S. 74 (1998). Nevertheless, we have distinguished "between oral statements that contradict or supersede the terms of an ERISA plan and oral interpretations of a plan's provisions that are not contrary to the plan's written provisions," and

may give effect to interpretations of ambiguous plan provisions. *Richardson*, 112 F.3d at 986 n.2.

Second, we have held that an ERISA beneficiary seeking to recover benefits under an equitable estoppel theory must establish "extraordinary circumstances." *Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1331 (9th Cir. 1996) (per curiam). "The actuarial soundness of pension funds is, absent extraordinary circumstances, too important to permit trustees to obligate the fund to pay pensions to persons not entitled to them under the express terms of the pension plan." *Phillips v. Kennedy*, 542 F.2d 52, 55 n.8 (8th Cir. 1976); *see also Rosen v. Hotel & Rest. Emps. & Bartenders Union of Phila.*, 637 F.2d 592, 598 (3d Cir. 1981). Although we have not defined "extraordinary circumstances" in this context, courts have held that making "a promise that the defendant reasonably should have expected to induce action or forbearance on the plaintiff's part," *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 86 (2d Cir. 2001), as well as "conduct suggesting that [the employer] sought to profit at the expense of its employees," a "showing of repeated misrepresentations over time," or evidence "that plaintiffs are particularly vulnerable," *Kurz v. Phila. Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996), can constitute extraordinary circumstances.

Accordingly, to maintain a federal equitable estoppel claim in the ERISA context, the party asserting estoppel must not only meet the traditional equitable estoppel requirements, but must also allege: (1) extraordinary circumstances; (2) "that the provisions of the plan at issue were ambiguous such that reasonable persons could disagree as to their meaning or effect"; and (3) that the representations made about the plan were an interpretation of the plan, not an

amendment or modification of the plan.  *Spink v. Lockheed Corp.*, 125 F.3d 1257, 1262 (9th Cir. 1997) (citing *Pisciotta*, 91 F.3d at 1331); *see also Greany*, 973 F.2d at 822 n.9 ("A plaintiff must first establish that the plan provision in question is ambiguous and the party to be estopped interpreted this ambiguity.  If these requirements are satisfied, the plaintiff may proceed with the equitable estoppel claim by satisfying" traditional equitable estoppel requirements.).

Third, "appropriate equitable relief" also includes "surcharge," defined as "the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment."  *Amara*, 131 S. Ct. at 1880 (citing Restatement (Third) of Trusts § 95 & cmt. a (Tent. Draft No. 5, Mar. 2, 2009)).  Under the traditional equitable principles specified in *Amara*, *id.* at 1879–80, the surcharge remedy was available when a breach of trust committed by a fiduciary resulted in a loss to the trust estate or allowed the fiduciary to profit at the expense of the trust.  *See* Restatement (Second) of Trusts § 205 (1959) (limiting a trustee's liability for breach of trust to "any loss or depreciation in the value of the trust estate," "any profit which would have accrued to the trust estate," and "any profit made by [the trustee]"); *see also* George Gleason Bogert et al., *The Law of Trusts and Trustees* § 862 (2013) (defining the three primary measures of damages for breach of trust to include "the loss in the value of the trust estate," "any profit [the trustee] has made," and "profit that would have accrued to the trust"); 4 Austin Wakeman Scott, William Franklin Fratcher, & Mark L. Ascher, *Scott and Ascher on Trusts* § 24.9, pp.1686–87 (5th ed. 2007) (same).  Under these circumstances, a surcharge remedy can protect the beneficiaries of a trust by making the trust estate whole.  "If a breach of trust causes a loss, including any failure to realize

income, capital gain, or appreciation that would have resulted from proper administration, the beneficiaries are entitled to restitution and may have the trustee surcharged for the amount necessary to compensate fully for the consequences of the breach." Restatement (Third) of Trusts § 95 & cmt. b (2012). However, "[t]he trustee is not subject to surcharge for a breach of trust that results in no loss to the estate" or profit to the trustee. 4 *Scott and Ascher on Trusts* § 24.9, p.1693; *see also id.* § 24.10, pp.1707–08; Thomas Lewin, *A Practical Treatise on the Law of Trusts and Trustees* ch. 26, § 3, p.604 (2d ed. 1858) ("In the event of a breach of trust, the *cestui que trust* is entitled to file a bill against the trustee . . . to compel from him personally a compensation for the loss the trust estate has sustained.").

Contrary to the dissent, *Amara* did not suggest that the remedy of surcharge is available to provide any sort of "[m]ake-whole relief for breach of fiduciary duty against a trustee" regardless "whether or not traditional trust law would have provided that relief under the 'surcharge' terminology." Dissent at 39. Rather, the Supreme Court followed its prior interpretation of "appropriate equitable relief" as including only traditional equitable remedies. *See Amara*, 131 S. Ct. at 1878 (observing that "appropriate equitable relief" refers to "those categories of relief that . . . were *typically* available in equity" (internal quotation marks and citation omitted)). In this vein, the Court carefully distinguished *Mertens*, which had held that "appropriate equitable relief" did not include "'compensatory damages' against a nonfiduciary." *Id.* at 1878 (quoting *Mertens*, 508 U.S. at 255). The Court pointed out that while *Mertens* disallowed a monetary remedy against a *non-fiduciary* under § 1132(a)(3), traditional equitable principles allowed surcharge as a "monetary remedy against a *trustee*," and "[t]hus, insofar as an award of make-whole

relief is concerned, the fact that the defendant in [*Amara*], unlike the defendant in *Mertens*, is analogous to a trustee makes a critical difference." *Id.* at 1880 (emphasis added). In explaining the scope of traditional equitable remedies, including surcharge, available against a trustee, the Court relied on standard trust treatises. *See, e.g.*, *id.* at 1881 (citing 4 *Scott and Ascher on Trusts* § 24.9, for the principle that "a court of equity would not surcharge a trustee for a nonexistent harm"). As the very section of *Scott and Ascher on Trusts* cited in *Amara* explains, "[t]he trustee is not subject to surcharge for a breach of trust that results in no loss to the trust estate." 4 *Scott and Ascher on Trusts* § 24.9, p.1693.[5]

We followed the traditional equitable principles and treatises relied on in *Amara* in our subsequent decision in *Skinner*, where we held that surcharge is an appropriate form of equitable relief to redress losses of value or lost profits to the trust estate and to require a fiduciary to disgorge profits from unjust enrichment. 673 F.3d at 1167. Specifically, *Skinner* held that if a trustee breaches a fiduciary duty: (1) the remedy of surcharge is available against the fiduciary "for benefits it gained through unjust enrichment or for harm caused as the result of its breach"; and (2) the trustee "could be liable for loss of value to the trust or for any profits that the trust would have accrued in the absence of the breach," in order to return the beneficiary to "the position he or she

---

[5] While *Amara* made the important determination that surcharge was a form of "appropriate equitable relief" potentially available under § 1132(a)(3), the Supreme Court concluded that it "need not decide which remedies are appropriate on the facts of this case." 131 S. Ct. at 1880. Indeed, the Supreme Court's analysis of surcharge was necessarily limited because neither the district court nor the Second Circuit had addressed the applicability of a surcharge remedy, *see id.* at 1882, and the parties had not briefed the issue, *see id.* at 1885 & n.3 (Scalia, J., concurring).

would have attained but for the trustee's breach." *Id.* *Skinner*'s identification of the two circumstances in which surcharge may be available is consistent with the Restatements of Trusts it cites, *see id.* (citing Restatement (Third) Trusts § 100(b) (2012), and Restatement (Second) of Trusts § 205 (1959)), as well as with the treatises cited by the Supreme Court in *Amara*, including Bogert, *The Law of Trusts and Trustees* § 862, and 4 *Scott and Ascher on Trusts* § 24.9, *see* 131 S. Ct. at 1880–81.

Relying on *McCravy v. Metropolitan Life Insurance Co.*, 690 F.3d 176 (4th Cir. 2012), Gabriel argues that surcharge is available more broadly than these traditional equitable principles suggest, and claims that he is entitled to make-whole relief, even if it comes at the expense of the trust estate. We disagree. *McCravy*, as well as subsequent similar decisions from the Fifth and Seventh Circuits, *see Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869 (7th Cir. 2013); *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448 (5th Cir. 2013), did not define the availability of surcharge, or even address whether the plaintiff was entitled to relief, *see, e.g.*, *McCravy*, 690 F.3d at 181–82 ("Whether McCravy's breach of fiduciary duty claim will ultimately succeed and whether surcharge is an appropriate remedy under Section 1132(a)(3) in the circumstances of this case are questions appropriately resolved in the first instance before the district court."). Instead, these circuits merely corrected district courts' erroneous interpretations of *Mertens* as precluding recovery of any monetary relief and remanded for the district courts to assess the merits of the plaintiffs' claims, along with the appropriateness of the surcharge remedy, in the first instance. *See Kenseth*, 722 F.3d at 883; *Gearlds*, 709 F.3d at 452;

*McCravy*, 690 F.3d at 181–82.[6] Accordingly, none of these circuits has had the opportunity to review the traditional trust law doctrines on which the Supreme Court relies and determine the sorts of surcharge remedies that may be available under those doctrines. *See Amara*, 131 S. Ct. at 1878 (defining "appropriate equitable relief" in § 502(a)(3) as "referring to 'those categories of relief' that, traditionally speaking . . . 'were *typically* available in equity'") (quoting *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 361 (2006)). We are bound by our own precedent, which correctly identifies surcharge as including only unjust enrichment and losses to the trust estate. *See Skinner*, 673 F.3d at 1167.

### B

We now turn to Gabriel's claim under § 1132(a)(3) that there is a genuine issue of material fact as to whether he is entitled to "appropriate equitable relief."[7]

---

[6] For this reason, it is misleading for the dissent to state that these cases "confirm that under *Amara*, surcharge is not limited to the circumstances in which a trustee personally benefits from a breach of duty or a plan incurs a loss." Dissent at 41.

[7] We may address this issue before asking whether Gabriel has created a genuine issue of material fact that the Fund violated the fiduciary duties set forth in § 1104(a)(1)(A) and (B). *See Mertens*, 508 U.S. at 254–55 (evaluating whether the relief sought constituted "appropriate equitable relief" and reserving decision on whether "a remedial wrong has been alleged").

1

We first consider Gabriel's argument that he is entitled to an order equitably estopping the Fund from relying on its corrected records that show his actual years of service.[8] Gabriel claims he meets the test for traditional equitable estoppel because: (1) the defendants were aware that he was not vested; (2) they nevertheless informed him in the January 7, 1997 letter that he would receive a monthly pension, and Gabriel was entitled to rely on this letter; (3) Gabriel was ignorant of the true facts; and (4) Gabriel relied on the misinformation in the January 1997 letter to his detriment by retiring at age 62 when he could have continued working. Further, Gabriel asserts that he has met the additional requirements set forth in *Spink*, because the provisions of the Plan were ambiguous, the plan representative provided an interpretation of the Plan, and there were extraordinary circumstances, including that the defendants operated under a conflict of interest and violated the procedural requirements of ERISA.

We need not determine whether Gabriel has raised a genuine issue of material fact as to every element of his equitable estoppel claim because we conclude that Gabriel has failed to show that the plan representative's January 1997 letter was an interpretation of ambiguous language in the Plan, rather than a mere mistake in assessing Gabriel's

---

[8] Gabriel's request for relief has changed over the course of this litigation. In his complaint, Gabriel asserted that the defendants should be estopped from denying that he qualified as a vested participant in the Plan. Because he now concedes that he did not vest in the Plan, he instead asserts that the defendants should be estopped from refusing to change the Fund's records to show him as vested.

entitlement to benefits. On its face, the letter does not provide an interpretation of the Plan, but merely provides the erroneous information that Gabriel is entitled to benefits of $1,236 per month upon retirement. Such an error in calculating benefits is just the sort of mistake that we repeatedly have held cannot provide a basis for equitable estoppel. We have made clear that "[a] plaintiff cannot avail himself of a federal ERISA estoppel claim based upon statements of a plan employee which would enlarge his rights against the plan beyond what he could recover under the unambiguous language of the plan itself." *Greany*, 973 F.2d at 822; *see also Renfro v. Funky Door Long Term Disability Plan*, 686 F.3d 1044, 1054 (9th Cir. 2012) (holding that "a beneficiary cannot obtain recovery on the basis of estoppel 'in the face of contrary, written plan provisions'") (quoting *Davidian*, 859 F.2d at 134)). "Our precedent dictates that a trust fund can never be equitably estopped where payment would conflict with the written agreement." *Greany*, 973 F.2d at 822. Nor is this principle limited to trust fund defendants, because we concluded in *Greany* that "no compelling reason [existed] to allow an estoppel claim to proceed solely because the individual or group to be estopped is other than a trust." *Id.*

To counter the weight of this precedent, Gabriel relies on *Spink*, and claims that the type of misinformation he received from the plan representative, when considered in conjunction with various provisions in the Plan, makes certain provisions in the Plan ambiguous as to him. To understand this argument, we must first take an in-depth look at *Spink*. In *Spink*, Lockheed hired the plaintiff, who was then 61 years old, away from a competitor. 125 F.3d at 1259. As part of its recruitment process, Lockheed represented that the plaintiff could participate in Lockheed's pension plan. *Id.* For the

next four years, Lockheed sent the plaintiff written year-end statements notifying him of the amount of credited service he had accumulated as a plan participant.  *Id.*  Eventually, Lockheed notified him he was not eligible to participate in the plan because he was over 60 when hired.  *Id.* at 1259–60. Although the district court granted Lockheed's motion to dismiss, *id.* at 1259, we reversed, rejecting Lockheed's argument that the pension plan unambiguously excluded the plaintiff from obtaining benefits, *see id.* at 1262–63.

In reaching that conclusion, we relied on two provisions of Lockheed's ERISA plan.  The first provision stated that "no Employee may become a Member if he commences employment on or after December 25, 1976, and, at the time of such commencement of employment, is sixty (60) years of age or older." *Id.* at 1262.  The second provided that "once each year the Retirement Plan Committee shall notify each Member in writing of his total Credited Service, according to the Corporation's records.  Such Credited Service shall be considered *correct* and *final* unless the Member files an objection by Filing With the Committee within thirty (30) calendared days following such notice."  *Id.*  Because the plaintiff had received "*correct* and *final*" year-end statements indicating that he had accrued credited service time, despite having been older than 60 when hired, we concluded there was sufficient ambiguity in the plan as applied to the plaintiff to allow the case to survive Lockheed's motion to dismiss. *Id.* at 1262–63.

Gabriel claims he is similarly situated to the employee in *Spink*, and points to two different provisions in the Plan. First, he identifies the "unambiguous statement in the AEPF plan that ten years of service are required."  This ten-year

vesting requirement is reflected in both section 5.01,[9] which sets the normal retirement date, and section 8.03,[10] entitled "vesting," which explains when a terminated participant will be considered to have vested.  Second, section 14.02 states that participants in the Plan "shall be entitled to obtain periodic reports showing the number of hours credited to their accounts at the administration office" and may show they are entitled to additional hours by filing a claim and evidence with the administration office within one year after the end of the disputed year.  Otherwise the "hours shall remain as

---

[9] Section 5.01(a) provides in relevant part:

> The Normal Retirement Date for a Participant shall be the first day of the month coincident with or immediately following his attainment of age 62, or one year after his Effective Date of Coverage, whichever is later and the date he has:

> (a) completed ten (10) Years of Service, of which at least one year must be Credited Future Service . . . .

[10] Section 8.03 provides in relevant part:

> A Participant who prior to January 1, 1978, fails to earn a total of at least 500 Hours of Service in a two-consecutive Plan Year period and a Participant, who on or after January 1, 1978, fails to earn at least 500 Hours of Service in a Plan Year shall be deemed a Terminated Vested Participant provided he has completed ten (10) or more Years of Service, of which one year was Credited Future Service.  Once he attains age 55, he shall be eligible to apply for a Retirement Income in accordance with the applicable provisions of Article VII[, which sets the amount of retirement income].

credited."[11]   According to Gabriel, the Fund gave him an unequivocal written statement that he would be entitled to $1,236 per month if he retired in 1997, implicitly indicating that he had enough hours of service to vest.  Gabriel reasons that, because he did not challenge the Fund's implicit indication that his service hours were sufficient for vesting, the "hours shall remain as credited" under section 14.02. Gabriel concludes that the clash between the Fund's implicit hours calculation in the representative's letter to him and the Plan's statement that ten years are required for vesting creates an ambiguity in the Plan's provisions.

We disagree.   Section 14.02 refers only to "periodic reports showing the number of hours credited" to a participant's account.  Gabriel does not claim he received or relied on such periodic reports when deciding to retire. Therefore, even if section 14.02's requirement that the hours in such a report "shall remain as credited" could create an ambiguity when read in connection with the vesting requirements in sections 5.01 and 8.03 under some circumstances, no such conflict exists in this case.

---

[11] Section 14.02 states in pertinent part:

> Participants shall be entitled to obtain periodic reports showing the number of house credited to their accounts at the administration office.  Participants who contend that they are entitled to be credited with a greater number of hours for any calendar year must file evidence in support of such claims with the administration office within one year after the end of the disputed year or the hours shall remain as credited. The Trustees shall determine the proper number of hours, if any, to be credited to such Participants.

Because section 14.02 is not applicable to Gabriel's claims, we are left with his argument that the misinformation provided by the plan representative in 1997 conflicts with the clear language of sections 5.01 and 8.03. This conflict does not cast doubt on the meaning or effect of those sections, however, but merely establishes that the defendants made misrepresentations, a necessary element of traditional estoppel. Reasonable persons could not disagree regarding the effect of sections 5.01 and 8.03. The plan representative's mistaken response to Gabriel's inquiry therefore "does not rise to the level of an interpretation of the plan's provisions justifying application of the equitable estoppel doctrine." *Greany*, 973 F.2d at 822.

Even if Gabriel could show that the Plan was ambiguous, he fails to satisfy another element necessary to qualify for equitable estoppel: that he was ignorant of the true facts. Gabriel does not dispute that he received the Fund's November 20, 1979 letter. This letter informed Gabriel that he had not been eligible to participate while a proprietor of Twin Cities between 1975 and 1978, that his hours accrued for Twin Cities would be deducted from his account, and that he had been terminated under section 8.01 of the Plan, which provides that a non-vested participant who, for any two consecutive plan years, has less than 500 hours of service will be deemed a terminated non-vested participant, absent reinstatement or some other exception. Gabriel argues that this letter was insufficient to inform him he was not vested, because it did not expressly state that he was ineligible to receive a pension unless he met certain criteria. The letter

itself belies this claim.[12]    Accordingly, the district court properly concluded that Gabriel was not entitled to relief based on estoppel as a matter of law.

2

We next turn to Gabriel's claim that he is entitled to the equitable remedy of reformation.  To qualify for reformation of the Plan based on mistake under trust or contract law principles, Gabriel would need to demonstrate that "a mistake of fact or law affected the terms" of the Plan, the relevant trust instrument here, and introduce evidence of the trust settlor's (or contractual parties') true intent.    *Skinner*, 673 F.3d at 1166.  Gabriel cannot meet this standard as a matter of law, because the Plan itself does not contain an error.  Gabriel concedes that he was a sole proprietor of Twin Cities from 1975 to 1978 and ineligible to participate in the Plan during that time, and therefore the Fund's current, corrected records accurately reflect the agreement between Gabriel and the Fund.  Instead, Gabriel wants to reform the Fund's administrative records to conform to the misinformation given him by the plan representative.  But reformation does not extend so far.  The administrative records are not part of the Plan, *see Amara*, 131 S. Ct. at 1877–78 (rejecting the use of non-plan summary documents to create new or different plan terms), and the Fund's mistaken administrative records did not reflect the parties' true intent in entering into the Plan.  Accordingly, the remedy of reformation due to mistake is not applicable in this context.

---

[12] Because the November 20, 1979 letter establishes that Gabriel knew or should have known that he was not vested, we do not need to reach his argument that he never received the December 3, 1979 letter.

Nor has Gabriel demonstrated that he is entitled to reformation based on fraud, because he does not allege that the Plan "was procured by wrongful conduct, such as undue influence, duress, or fraud" or that he "was justified in relying on the [Fund's] misrepresentations." *Skinner*, 673 F.3d at 1166. Accordingly, Gabriel has not adduced evidence giving rise to a genuine issue of material fact that he is entitled to reformation.

Gabriel argues that our decision in *Mathews v. Chevron Corp.*, 362 F.3d 1172 (9th Cir. 2004), supports his reformation claim. In *Mathews*, Chevron management adopted a program to reduce its workforce by offering an enhanced retirement benefit to any participant in Chevron's ERISA plan who was involuntarily terminated without cause, including those employees who expressed an interest in such "involuntary" termination. *Id.* at 1176–77. Despite this program, plant general managers at first continued to exercise significant personnel discretion. The Richmond plant general manager repeatedly informed his employees that he did not plan to adopt the enhanced benefit program, and certain employees at the plant voluntarily retired. *Id.* at 1177. When Chevron ultimately instituted the program at Richmond, the retired employees sued for the enhanced benefits. *Id.* at 1177–78. It was undisputed that all of the employees would have been selected for involuntary termination had they expressed an interest. *Id.* at 1186. We held that Chevron breached its fiduciary duty to these employees once it began to seriously consider implementing the program in Richmond. Therefore, we affirmed the district court's order that Chevron had to modify its records to show that the retired plaintiffs had been involuntarily terminated and were eligible for enhanced benefits. *Id.* at 1186–87. The remedy was "appropriate equitable relief" because it operated merely to

provide the participants with the benefits they would have been received but for the breach. *Id.* (internal quotation marks omitted).

*Mathews* does not help Gabriel here. In *Mathews*, the employees had been eligible to participate in the enhanced benefits program, and would have participated but for the fiduciary's misinformation. *Id.* at 1186. Here, by contrast, Gabriel was not eligible to participate in the Plan, and the misinformation he received in 1997 from a plan representative did not prevent him from obtaining any benefit under the Plan to which he otherwise would have been entitled. Whereas the order in *Mathews* allowed the employees to get the benefit of the involuntary termination program, but did not alter the terms of the Plan as written, *see id.* at 1186–87, the order Gabriel seeks here necessarily would require violating the terms of the Plan by deeming an ineligible person to be eligible for pension benefits. Equitable remedies are not available where the claim "would result in a payment of benefits that would be inconsistent with the written plan." *Greany*, 973 F.2d at 822.

3

Finally, we turn to Gabriel's claim that he is entitled to the equitable remedy of surcharge, to receive an amount equal to the benefits he would have received if he had been a participant with the hours erroneously reflected in the Fund's records when he applied for benefits. This claim also fails. While a trust beneficiary may remedy unjust enrichment through surcharge by requiring "[a] trustee (or a fiduciary) who gains a benefit by breaching his or her duty [to] return that benefit to the beneficiary," *Skinner*, 673 F.3d at 1167, Gabriel does not argue that any of the defendants here were

unjustly enriched by their alleged breaches of fiduciary duty. Nor could he, because the defendants merely prevented Gabriel from receiving benefits that he was not entitled to receive under the Plan, and such actions appropriately discharged the fiduciaries' duty to act "solely in the interest of the participants and beneficiaries," the individuals eligible to receive such benefits from the Fund.  29 U.S.C. § 1104(a)(1); *see also id.* § 1002(7), (8) (defining "participant" and "beneficiary" to require potential "eligibil[ity] to receive a benefit" under a plan).

Nor is Gabriel seeking a monetary award to recoup losses the Fund suffered from any fiduciary's breach.  Under traditional trust principles, "[a] trustee who breaches his or her duty could be liable for loss of value to the trust or for any profits that the trust would have accrued in the absence of the breach," and "[t]he beneficiary can pursue the remedy that will put the beneficiary in the position he or she would have attained but for the trustee's breach."  *Skinner*, 673 F.3d at 1167.  In short, the beneficiary is entitled to restoration of the trust res, not to benefit at the expense of other beneficiaries. Indeed, under traditional trust law principles, a beneficiary could be obliged to repay any payments received in error from the trust.  *See* Bogert, *The Law of Trusts and Trustees* § 191 ("A co-beneficiary owes his fellow beneficiaries a duty to restore to the trust fund payments made to him from trust principal or income which were improperly made, either due to mistake or willful breach of trust.").  Because the surcharge remedy Gabriel seeks would not restore the trust estate, but rather would wrongfully deplete it by paying him benefits he is not eligible to receive under the Plan, under *Skinner* and trust law principles, Gabriel is not entitled to surcharge as a remedy under § 1132(a)(3) as a matter of law.

Because Gabriel is not entitled to estoppel, reformation, or surcharge, as a matter of law, we affirm the district court's grant of summary judgment in favor of the defendants on Gabriel's breach of fiduciary and co-fiduciary duty claims under § 1132(a)(3).[13]  The basis for our decision obviates the need for us to reach the question whether the defendants' actions here breached their fiduciary duty by violating ERISA or the terms of the Plan.  *Mertens*, 508 U.S. at 254–55.

### III

We now turn to Gabriel's argument under § 1132(a)(1) that the defendants erred in denying him benefits on the ground that he was non-vested.  Gabriel does not claim that the Fund erred in determining that he had not vested in the Plan.  Rather, he argues that the Fund waived this rationale for denying him benefits because the Fund did not raise his non-vested status until 2004, three years after the Fund first suspended benefits on the ground that Gabriel was engaged in improper post-retirement work in the industry.

The Fund did not abuse its discretion here.  Under ERISA, an employee benefit plan must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied" and must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C. § 1133; *see also* 29 C.F.R.

---

[13] Gabriel's breach of co-fiduciary duty claim fails for the same reasons as his breach of fiduciary duty claim.  *See* 29 U.S.C. § 1105(a) (creating co-fiduciary liability in certain circumstances when there is an underlying breach of another fiduciary's duty).

§ 2560.503–1(g)(1), (h)(2).   Given these statutory and regulatory requirements, we have held that an administrator may not raise a new reason for denying benefits in its final decision, because that would effectively preclude the participant "from responding to that rationale for denial at the administrative level," and insulate the rationale from administrative review. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir 2006) (en banc); *see also Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir. 2008) (holding that a plan administrator must provide a participant with the reasons for a benefits denial at a time when the participant "had a fair chance to present evidence on this point," and should not add a new reason in the administrator's final denial).   Where the administrator's final denial contains a new rationale for denying a claim, the participant may present evidence on that point to the district court, which must consider it. *Saffon*, 522 F.3d at 872.   Further, the district court can take into account the administrator's violation of ERISA's procedural requirements in determining how much deference to give the administrator's final decision. *Id.* at 873.

In this case, the Fund did not violate ERISA's procedural requirements because it notified Gabriel regarding his non-vested status while Gabriel's administrative case was still pending before the Appeals Committee.   The Fund did not put a new rationale for denying benefits into a final decision in a manner that would insulate the denial from administrative review. *Cf. Abatie*, 458 F.3d at 974.   The Appeals Committee had not yet ruled on Gabriel's claim for benefits when it discovered his non-vested status, and nothing precluded Gabriel from further litigating the Fund's decision to deny him benefits through the Fund's administrative review process.   Indeed, Gabriel had the opportunity to

present evidence to the Appeals Committee on this very issue, because the district court remanded his benefits claim to the Appeals Committee. As we noted in *Saffon*, if a plan administrator fails to give timely notice, the plaintiff is not entitled to an award of benefits, but only to the opportunity to present evidence to challenge the plan administrator's new determination. *See* 522 F.3d at 872–74. Gabriel got just such a remedy in this case. Accordingly, we reject Gabriel's arguments that the Fund failed to comply with ERISA procedural requirements, or that it waived its determination that Gabriel never vested, and affirm the district court's deference to the Fund's denial of benefits.

## IV

Because Gabriel cannot demonstrate that he is entitled to any of the equitable remedies available under § 1132(a)(3), or that the Fund waived its argument that he never vested, we affirm the district court's grant of summary judgment in favor of the defendant.

**AFFIRMED.**

BERZON, Circuit Judge, concurring and dissenting:

The majority opinion disregards Supreme Court guidance in *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011), and creates a conflict with recent decisions of the Fourth, Fifth, and Seventh Circuits. As Gabriel may be entitled to an equitable remedy similar to surcharge, I dissent from Part II(B)(3) of the majority opinion, but concur in the remainder.

Gabriel seeks a "remedy that will put [him] in the position he . . . would have attained but for the trustee[s]'[] breach." *Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1167 (9th Cir. 2012). *Amara* described "this kind of monetary remedy against a trustee" as "'exclusively equitable.'" 131 S. Ct. at 1880 (citation omitted). Although *Amara* identified such relief as "sometimes called a 'surcharge,'" the focus was not on the particulars of traditional surcharge law. *Id.* (citation omitted). Instead, *Amara* embraced the concept that where the defendant is "analogous to a trustee," the "'charge [against] the defendant, as a trustee, [is] for breach of trust," and "award [is] of make-whole relief," then "the remedies . . . fall within the scope of the term 'appropriate equitable relief.'" *Id.* (citation omitted).

The majority understands *Amara* otherwise — as providing for make-whole relief against a trustee for breach of fiduciary duty only when the breach (1) "result[s] in a loss to the trust estate[;]" or (2) "allow[s] the fiduciary to profit at the expense of the trust." Maj. Op. at 19; *see also id.* at 33 (quoting *Skinner*, 673 F.3d at 1167). As Gabriel has failed to demonstrate either an unjust enrichment by a trustee or a loss to the plan, the majority holds he is not entitled to surcharge as a matter of law. *Id.* at 32–34.

But the holding of *Amara* is not so limited. *Amara* noted that the "surcharge remedy [had] extended to a breach of trust committed by a fiduciary encompassing *any* violation of a duty imposed upon that fiduciary." 131 S. Ct. at 1880 (emphasis added); *see also* J. Eaton, Handbook of Equity Jurisprudence § 212, at 439 (1901) ("A breach of trust by a trustee creates a personal obligation . . . which may be enforced against the trustee or his estate in a proper proceeding."). Explaining its reasoning, *Amara* noted that

"before the merger of law and equity," a beneficiary could bring suit for breach of fiduciary duty "only in a court of equity, not a court of law." 131 S. Ct. at 1879. Equity courts accordingly developed "specially tailored remedies" such as surcharge "to fit the nature of the right they sought to protect because '[e]quity suffers not a right to be without a remedy.'" *Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 878 (7th Cir. 2013) (quoting *Amara*, 131 S. Ct. at 1879) (quotation marks and citation omitted). The broad character of the remedies identified in *Amara* is clearly described in the portion of a treatise it quoted:

> Equity is primarily responsible for the protection of rights arising under trust, and will provide the beneficiary with whatever remedy is necessary to protect him and recompense him for loss, in so far as this can be done without injustice to the trustee or third parties.

> The court is not confined to a limited list of remedies but rather will mold the relief to protect the rights of the beneficiary according to the situation involved.

G. Bogert & G. Bogert, *Trusts and Trustees* § 861 at 3–4 (rev. 2d ed. 1995) (second sentence quoted in *Amara*, 131 S. Ct. at 1881).

"Thus, insofar as an award of make-whole relief is concerned, the fact that the defendant . . . is analogous to a trustee makes a critical difference." *Amara*, 131 S. Ct. at 1880 (distinguishing prior case law concerning non-fiduciary defendants). Beyond that "critical difference," *id.*, *Amara*

was concerned with whether relief sought under 29 U.S.C. § 1132(a)(3) "resembles *forms* of traditional equitable relief," *id.* at 1879 (emphasis added), not whether the precise requirements for obtaining such relief under the common law of trusts are met.  Make-whole relief for breach of fiduciary duty against a trustee conforms to that description, whether or not traditional trust law would have provided that relief under the "surcharge" terminology.

Given its breadth, *Amara* has rightly been described as a "'[a] striking development,'" *McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 180 (4th Cir. 2012), "that significantly altered the understanding of equitable relief available under" § 1132(a)(3), *Kenseth*, 722 F.3d at 876, in cases alleging a breach of fiduciary duty.  Indeed, several other circuits have overruled their own precedents in its wake.  *See, e.g.*, *McCravy*, 690 F.3d at 180 ("Before *Amara*, various lower courts, including this one, had (mis)construed Supreme Court precedent to limit severely the remedies available to plaintiffs suing fiduciaries under [§] 1132(a)(3).").  The majority nonetheless treats *Amara* as a continuation of prior case law, Maj. Op. at 20, hardly citing it in the portion of its opinion holding Gabriel not entitled to relief under § 1132(a)(3) as a matter of law.  *See id.* at 23–34.

The recent decisions from the Fourth, Fifth, and Seventh Circuits confirm that the doctrine of surcharge is, after *Amara*, not as narrow as the majority contends.  In *McCravy*, for example, the defendant accepted life insurance premiums from a plan participant on behalf of the participant's daughter, even though the daughter was ineligible for coverage.  690 F.3d at 178.  When the participant filed a claim for benefits following her daughter's death, the plan "attempted to refund multiple years' worth of premiums"

rather than pay the claim.  *Id.*  The Fourth Circuit held that under the surcharge doctrine, which it characterized as "make-whole relief," the participant's "potential recovery" was "not limited . . . to a premium refund."  *Id.* at 181.  That was so even though paying the participant's benefits would hold the fiduciaries liable neither for "loss of value to the trust," nor for "profits that the trust would have accrued in the absence of the breach."  *Skinner*, 673 F.3d at 1167.

Similarly, the participant in *Gearlds v. Entergy Services, Inc.*, 709 F.3d 448 (5th Cir. 2013), waived medical benefits available under his wife's retirement based on his own plan's "assurances" that he would be covered for life.  The plan later determined that it had inaccurately "comput[ed] Gearlds's service time under the retirement plan" and withdrew his medical coverage.  *Id.* at 449–50.  The Fifth Circuit held that Gearlds stated a "plausible claim" for surcharge relief, *id.* at 452, again, notwithstanding that the medical benefits he sought had nothing to do with unjust enrichment by a trustee or a loss to the trust.

Finally, in *Kenseth*, the Seventh Circuit construed *Amara* as stating a similarly broad view of surcharge — that "make-whole money damages" are an available "equitable remedy" whenever a plan participant demonstrates (1) a breach of a fiduciary duty, (2) causing damages.  722 F.3d at 882.  Kenseth had undergone surgery based on the health plan's customer service representative's assurance that the surgery would be covered, but the plan subsequently denied coverage.  *Id.* at 871–72.  Noting that *Amara* "clarified that equitable relief may come in the form of money damages when the defendant is a trustee in breach of a fiduciary duty[,]" *id.* at 878–79, the Seventh Circuit held "that if Kenseth is able to demonstrate a breach of fiduciary duty . . . , and if she can

show that the breach caused her damages, she may seek an appropriate equitable remedy including make-whole relief in the form of money damages," *id.* at 883.

*McCravy*, *Gearlds*, and *Kenseth* confirm that under *Amara*, surcharge is not limited to the circumstances in which a trustee personally benefits from a breach of duty or a plan incurs a loss.  Instead, the remedy is based on equity courts' "power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty," and is intended to "make" a plan participant "whole." *Amara*, 131 S. Ct. at 1880.

The majority disputes that these recent cases "define the availability of surcharge."  Maj. Op. at 22.  In the majority's view, these cases "merely corrected district courts' erroneous" conclusions that no monetary relief was available under § 1132(a)(3), and "remanded for the district courts to assess . . . the appropriateness of the surcharge remedy, in the first instance." *Id*. at 22.  These reasoned opinions from other circuits cannot be dispatched so easily.  Had they concluded, like the majority here, that surcharge was limited to unjust enrichment by a trustee or a loss to the plan, *McCravy*, *Gearlds*, and *Kenseth* would have each held their respective participant not entitled to surcharge as a matter of law.  In each case, a participant sought benefits to which he was not entitled under the terms of the plan.  There was neither claimed unjust enrichment by the trustee nor a loss to the plan.  There was simply an alleged breach of fiduciary duty and a loss of benefits to the participant himself.  Although each remanded to the district court to determine whether the defendant "breached its fiduciary duty" and "[i]f so, . . . whether that breach . . . harmed" the participant, the appellate courts made clear that if these questions were answered in the

affirmative, the participant could "seek an appropriate equitable remedy including make-whole relief in the form of money damages." *Kenseth*, 722 F.3d at 890, 883.

Indeed, the majority's narrow view of *Amara* is unsupported by the facts of that case itself, which involved neither a loss to the trust estate nor unjust enrichment by the fiduciary. The breach alleged in *Amara* was not the underlying decision to alter CIGNA's retirement benefit offerings. Instead, it was the fiduciary's "fail[ure] to give [plan participants] proper notice of changes to their benefits," *Amara*, 131 S. Ct. at 1870, and instead sending "descriptions of its new plan [which] were significantly incomplete and misle[a]d[ing]," *id.* at 1872. Although the fiduciary saved $10 million annually by changing the retirement benefits available to its employees, those savings did not result from the alleged breach. There is no indication that but-for the improper notice, CIGNA would not have instituted the plan changes and obtained the resulting savings. Indeed, the district court in *Amara* noted that participants may not "have received a larger benefit were the notices accurate," acknowledging that the harm caused by the improper notice was different from the harm caused by the changes to the plan. *Amara v. Cigna Corp.*, 534 F. Supp. 2d 288, 353 (D. Conn. 2008), *aff'd*, 348 F. App'x 627 (2d Cir. 2009), *vacated and remanded*, 131 S. Ct. 1866 (2011). *Amara* was not, therefore, a case in which "a breach of trust committed by a fiduciary resulted in a loss to the trust estate or allowed the fiduciary to profit at the expense of the trust" — the only two circumstances in which the majority believes surcharge to be available. Maj. Op. at 19.

Nor does our precedent in *Skinner* limit ERISA make-whole equitable relief for a breach of fiduciary duty to "only

unjust enrichment and losses to the trust estate" such that we are "bound" to hold as the majority does.  Maj. Op. at 23. Although *Skinner* describes only two bases for surcharge, it does not identify them as exclusive, or opine that no other retroactive make-whole relief is available under § 1132(a)(3). Indeed, *Skinner* notes that "[t]he beneficiary can pursue the remedy that will put the beneficiary in the position he or she would have attained but for the trustee's breach," 673 F.3d at 1167, echoing the broader view of surcharge-like relief expressed in *Amara*.

The majority opinion thus seriously misunderstands the reach of *Amara* and brings us needlessly into conflict with all other circuits to have considered the scope of the equitable remedies available after *Amara*.  I therefore dissent from the majority's limitations on the make-whole equitable relief available under § 1132(a)(3).

As the majority holds Gabriel not entitled to an "appropriate equitable remedy" under § 1132(a)(3) as a matter of law, it affirms the district court without considering whether Gabriel has raised a triable issue of fact as to the other elements of a breach of fiduciary duty claim.  I would conclude he has.

There can be little dispute that the fiduciary defendants breached their duties to Gabriel by giving him incorrect information about his rights under the plan.  *See, e.g.*, *Bins v. Exxon Co. U.S.A.*, 220 F.3d 1042, 1054 (9th Cir. 2000) (en banc) (noting "an ERISA fiduciary's duty . . . [to] giv[e] complete and accurate answers to the employee's questions"). Gabriel has also adduced sufficient evidence to raise a triable issue as to whether that breach caused him harm by leading him to retire when he was still healthy enough to work.  That

the "the misinformation [Gabriel] received in 1997 from a plan representative did not prevent him from obtaining any benefit *under the Plan* to which he otherwise would have been entitled," Maj. Op. at 32 (emphasis added), because it was "eleven years too late for him to" accrue the required additional years of service, as noted by the Fund's Appeals Committee, is not a pertinent consideration.  Gabriel's complaint is not that he could have accrued additional years of service had he been properly informed, but that he relied on the representation that he had already accrued adequate service, and on the resulting pension payments.  As there are triable issues of fact regarding whether Gabriel was harmed by the defendants' breach, and, if so, whether make-whole relief would remedy that harm, I would reverse the district court's grant of summary judgment in favor of defendants and remand for further proceedings.[1]

Because the panel misconstrues *Amara* and misapplies it to this case, I respectfully dissent.

---

[1] I recognize that the record could support the conclusion that Gabriel knew or should have known he was not vested as early as 1979.  As there are triable issues of fact regarding Gabriel's reliance on defendants' misrepresentations, this case is not appropriate for summary judgment.